1 | JOHN P. REITMAN (State Bar No. 80579)
jreitman@lgbfirm.com
2 | MONICA RIEDER (State Bar No. 263250)
mrieder@landaufirm.com
3 | JACK A. REITMAN (State Bar No. 283746)
jareitman@lgbfirm.com
4 | LANDAU LAW LLP
1880 Century Park East, Suite 1101
5 | Los Angeles, California 90067
Telephone: (310) 557-0050
6 | Facsimile: (310) 557-0056

7 | Special Litigation Counsel for
Richard A. Marshack,
8 | Chapter 7 Trustee for Eagan Avenatti, LLP

9

**UNITED STATES BANKRUPTCY COURT**

10

**CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

11

| In re | Case No. 8:19-bk-13560-CB |
|---|---|
| EAGAN AVENATTI, LLP, | Chapter 7 |
| Debtor. | Adversary No. 8:19-ap-01186-CB |

**TRUSTEE'S NOTICE OF EMERGENCY MOTION AND EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND PREJUDGMENT WRIT OF ATTACHMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JACK A. REITMAN; EXHIBIT**

| RICHARD A. MARSHACK, CHAPTER 7 TRUSTEE FOR EAGAN AVENATTI, LLP, | |
|---|---|
| Plaintiff, | |
| v. | |
| MICHAEL AVENATTI, an individual; LISA STORIE-AVENATTI, an individual; AVENATT & ASSOCIATES APC, a professional corporation; and DOES 1-10, Inclusive, | |
| Defendants. | |

**Hearing Date and Time:**
Date:  April 17, 2020
Time:  11:00  a.m.
Place:  411 West Fourth Street
        Courtroom 5D
        Santa Ana, California

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**TO THE HONORABLE JUDGE CATHERINE E. BAUER, UNITED STATES BANKRUPTCY JUDGE, ALL PARTIES-IN-INTEREST AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Richard A. Marshack, chapter 7 trustee (the "Trustee") for the bankruptcy estate of Eagan Avenatti, LLP ("EA"), on Friday, April 17 at 11:00 a.m. at 411 West Fourth Street, Courtroom 5D, Santa Ana, California, moves the Court (the "Motion") for a preliminary injunction and pre-judgment writ of attachment as to any and all property of Michael J. Avenatti ("Avenatti") or his affiliates (the "Avenatti Affiliates")[1] (the "Avenatti Assets") currently in possession of Hubert Bromma ("Bromma") or The Entrust Group.

**PLEASE TAKE FURTHER NOTICE** that on April 4, 2020, Avenatti filed a Second *Ex Parte* Motion for Bond Pending Trial (the "Second Ex Parte Motion") in *U.S. v. Avenatti*, 8:19-cr-00061-JVS (Docket No. 136) (the "California Case"), attempting to remove him from his confinement at the Municipal Correction Center ("MCC") in New York, New York.  In the Second Ex Parte Motion, it was disclosed that Hubert Bromma, the owner and Chief Executive Officer of The Entrust Group ("Entrust"), an investment firm (specifically self-directed retirement plans), is willing to post real property in San Luis Obispo as surety for $500,000 and sign a $1,000,000 surety bond, all for Avenatti's release from the MCC.

**PLEASE TAKE FURTHER NOTICE** that given Avenatti's "compromised" prospects for the future, and his conduct as alleged in the California Criminal Case and his recent conviction in *U.S. v. Avenatti,* 1:19-cr-373-PGG (the "Extortion Case"), it is suspect why *anyone* would take such a risk on behalf of Avenatti.  Further, Avenatti has a history (both recently and for years prior) of money laundering, tax evasion, and purposeful evasion of creditors (*see* California Case, Docket No. 98).  Therefore, it is likely that the $500,000 Bromma is putting up for Avenatti's

---

[1] "Avenatti Affiliates" means any one or more of Michael Avenatti; Michael Avenatti, Esq.; Michael J. Avenatti; Augustus, LLP; Avenatti, LLP; Avenatti & Associates; Avenatti & Associates, APC; Michael Avenatti Trust; Desert Harvest, LLC; Desert Harvest Development LLC; Double Down, LLC; Doppio, Inc.; GB Autosport LLC; Global Baristas US, LLC; Global Baristas, LLC; MJA Esq.; Nero; Passport 420 LLC; Trial Lawyers; The Trial Group, LLC; Tyrian Systems, LLC; We're Still Here, LLC; 21923 Parthenia St., LLC; any predecessor or successor in interest to any of the foregoing; and any other person identified by Avenatti or any of the above-identified Avenatti Affiliates to Bromma or Entrust as controlled by Avenatti or an Avenatti Affiliate.

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

release is at the very least backed by Avenatti Assets that Bromma and Entrust may have in their respective possession, custody or control, which are likely the fruits of Avenatti's conduct as alleged in the California Case and likely derived, at least in part, from EA or its former clients. For this reason, the Trustee seeks to enjoin Bromma and Entrust for moving, sequestering, selling, transferring or otherwise disposing of any Avenatti Assets and seeks to levy a pre-judgment writ of attachment on the Avenatti Assets.

**PLEASE TAKE FURTHER NOTICE** that the Motion is brought under Federal Rule of Bankruptcy Procedure 7064, 7065, California Civil Code § 3439.07, and California Code of Civil Procedure § 481.010 *et seq* on the grounds that the Avenatti Assets likely being held by Bromma or Entrust are (i) likely the product of Avenatti's years of alleged criminal behavior and (ii) subject to the Trustee's claims against Avenatti in this adversary proceeding.

**PLEASE TAKE FURTHER NOTICE** that the property subject to this Motion includes all money and other property of Avenatti or the Avenatti Affiliates currently in the possession, custody or control of Bromma and/or Entrust.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on this notice, the attached Memorandum of Points and Authorities, the attached Declaration of Jack A. Reitman (with exhibits), the pleadings and records filed in this case, and any additional evidence and argument that may be presented to the Court.

**PLEASE TAKE FURTHER NOTICE** that any opposition to the Motion may be made at hearing.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1       **WHEREFORE** for all the foregoing reasons, the Trustee respectfully requests that the

2 Court grant the Motion and issue a preliminary injunction enjoining and restraining Bromma and

3 Entrust, and each of their respective controlled entities, agents, servants, employees, and attorneys,

4 and others acting in concert or participating with any of them, from directly or indirectly

5 assigning, dissipating, distributing, encumbering, hypothecating, moving, pledging, selling,

6 transferring, or otherwise disposing of any Avenatti Assets or any interests therein, without further

7 leave of Court and/or the written consent of the Trustee.  The Trustee further requests that the

8 Court issue a pre-judgment writ of attachment to be placed on the Avenatti Assets in the

9 possession, custody or control of Bromma or Entrust.

10

11 Dated:  April 16, 2020                  Respectfully submitted,

                                        LANDAU LAW LLP

13                                     By:_____/s/ Jack A. Reitman_____

14                                         Jack A. Reitman
                            Special Litigation Counsel for Richard A. Marshack,

15                             Chapter 7 Trustee for Eagan Avenatti, LLP

16

17

18

19

20

21

22

23

24

25

26

27

28

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Landau Law LLP
ATTORNEYS AT LAW
Los Angeles, California

## MEMORANDUM OF POINTS AND AUTHORITIES

Richard A. Marshack,, chapter 7 trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Eagan Avenatti, LLP ("EA") moves the Court (the "Motion") for a preliminary injunction and pre-judgment writ of attachment as to any and all property of Michael J. Avenatti ("Avenatti") or his affiliates (the "Avenatti Affiliates")[2] currently in possession, custody or control of Hubert Bromma ("Bromma") or The Entrust Group (the "Avenatti Assets").[3]  Also submitted is the Declaration of Jack A. Reitman (the "Reitman Dec."), with exhibits.

## I.    STATEMENT OF FACTS

On February 14, 2020 a jury in the United Stated District Court for the Southern District of New York found Avenatti guilty of transmission of interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d); attempted extortion, in violation of 18 U.S.C. § 1951; and honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346. *U.S. v. Avenatti*, 1:19-cr-373-PGG (the "Extortion Case").  Sentencing in the Extortion Case is currently scheduled for June 17, 2020.  Avenatti is also awaiting a second trial in the United Stated District Court for the Southern District of New York regarding his allegedly fraudulent conduct with respect to Ms. Stephanie Clifford aka Stormy Daniels (*U.S. v. Avenatti*, 1:19-cr-374-JMF).

On March 18, 2020, Avenatti filed an *ex parte* application to reconsider his bail/temporary release pending trial in *U.S. v. Avenatti*, SA-cr-19-61-JCS (the "California Case") over rising concerns of the COVID-19 pandemic in the Municipal Correction Center ("MCC") in New York City, where Avenatti was being held.  That *ex parte* application was denied by the court in the California Case on March 21, 2020.  On March 26, 2020, Avenatti filed a Motion for

---

[2] "Avenatti Affiliates" means any one or more of Michael Avenatti; Michael Avenatti, Esq.; Michael J. Avenatti; Augustus, LLP; Avenatti, LLP; Avenatti & Associates; Avenatti & Associates, APC; Michael Avenatti Trust; Desert Harvest, LLC; Desert Harvest Development LLC; Double Down, LLC; Doppio, Inc.; GB Autosport LLC; Global Baristas US, LLC; Global Baristas, LLC; MJA Esq.; Nero; Passport 420 LLC; Trial Lawyers; The Trial Group, LLC; Tyrian Systems, LLC; We're Still Here, LLC; 21923 Parthenia St., LLC; any predecessor or successor in interest to any of the foregoing; and any other person identified by Avenatti or any of the above-identified Avenatti Affiliates to Bromma or Entrust as controlled by Avenatti or an Avenatti Affiliate.

[3] The Avenatti Assets do not include any exempt property, pursuant to California Code of Civil Procedure § 704.0101 *et seq.* but do include conditionally exempt property such as self-employed retirement plans (IRA) pursuant to California Civil Code § 704.115(a)(3), (e).

1  Reconsideration of Bail Pending Trial, citing the same concerns as in the previous *ex parte*

2  application (California Case, Docket No. 125) ("First Motion for Reconsideration").  In the First

3  Motion for Reconsideration, Bromma, the owner and Chief Executive officer of The Entrust

4  Group (an investment firm), was offered as the source of a $300,000 bond for the temporary

5  release of Avenatti.  The First Motion for Reconsideration was denied on March 27, 2020, and a

6  second motion for reconsideration (the "Second Motion for Reconsideration") was filed on March

7  30, 2020, which also mentioned Bromma.

8       On April 4, 2020, before the Second Motion for Reconsideration could be ruled upon,

9  Avenatti filed a second *ex parte* application for reconsideration of bail pending trial (the "Second

10 *Ex Parte* Application").  Reitman Dec., Ex. 1, California Case Docket No. 136.  The Second Ex

11 Parte Application states that Mr. Bromma (i) is willing to sign a $1,000,000 signature bond for

12 Avenatti's release and (ii) is placing real property in San Luis Obispo worth at least $500,000 as

13 surety for Avenatti's bond.  Second *Ex Parte* Application, 2:11-16 and 8:7-10.  The Second *Ex*

14 *Parte* Application was granted on April 7, 2020.  California Case, Docket No. 138.

15      This raises an interesting question: why is Bromma, the owner and CEO of a large

16 investment firm, willing to put up $1,000,000 (half of which in hard assets) to let Avenatti, a

17 convicted felon, out of jail.  The likely scenario is that although Bromma probably is "a long time

18 friend" of Avenatti, it is also equally likely that Bromma and his company Entrust are holding

19 assets for Avenatti and/or the Avenatti Affiliates.  Given Avenatti's current financial state (so far

20 as the Trustee knows) and the fact that EA was the economic engine by which Avenatti drove his

21 life, at least a substantial portion of the funds placed with Bromma and Entrust are products of

22 Avenatti's criminal conduct as alleged in the California Case, and should be preserved for the

23 benefit for the Estate.   Therefore, the Trustee requests that a preliminary injunction and pre-

24 judgment writ of attachment be placed on Bromma, Entrust, and any and all Avenatti Assets in

25 their respective possession, custody or control.

26 / / /

27 / / /

28 / / /

6

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

II.    **ARGUMENT**

A.    **The Court Should Grant Injunctive Relief Pursuant to Federal Rule of Bankruptcy Procedure 7065.**

The issuance of injunctive relief is governed by Federal Rule of Bankruptcy Procedure 7065 (adopting Federal Rule of Civil Procedure 65), which authorizes temporary restraining orders, as well as preliminary and permanent injunctive relief.  A party seeking such injunctive relief must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 24-25 (2008); *accord Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126-27 (9th Cir. 2009); *Kremen v. Cohen,* 2011 U.S. Dist. LEXIS 141273 at *11 (N.D. Cal. Dec. 7, 2011).

In the Ninth Circuit, a "sliding scale" approach is utilized in evaluating whether to grant injunctive relief *pendente lite*, with the elements being balanced so that a strong showing on one may offset a weaker showing on another.  *E.g., Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1134-35 (9th Cir. 2011).  Thus, even if there are "serious questions going to the merits," injunctive relief may be issued if the balance of hardship "tips sharply towards the plaintiff," and if irreparable injury is likely and the public interest served.  *Id.*

1.    **The Trustee is Likely to Succeed on the Merits of his Claims against Avenatti.**

To establish a substantial likelihood of success on the merits, the plaintiff must show "a fair chance of success."  *In re Focus Media, Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004) (citation omitted).

The Trustee is likely to succeed in demonstrating that Avenatti committed the acts as described in the Complaint – those facts and actions run parallel to the criminal proceedings against Avenatti, and Avenatti has already been found guilty in one (the Extortion Case) of those proceedings, much less the California Case where the evidence against him is both (i) legion and (ii) for lack of a better descriptor, indisputable.  Avenatti spent the past eight years directing EA to (i) fail to file tax returns; (ii) fail to pay taxes; (iii) fail to pay its creditors; (iv) steal from its

1  clients; and (v) defraud banks.  Avenatii also faces bankruptcy fraud charges in connection with

2  EA's first bankruptcy case filed in this Court.  California Case, Docket No. 16.

3      Moreover, this Court has already found that Avenatti did direct EA to sequester

4  approximately $100,000 worth of artwork from the former receiver for EA (Adv. Docket No. 5,

5  Order Granting Trustee's Emergency Motion for Preliminary Injunction [as to EA artwork]).

6          **2.      The EA Bankruptcy Estate will Suffer Irreparable harm if a**

7                  **Preliminary Injunction is Not Issued.**

8      A party seeking injunctive relief "must show a likelihood of dissipation of the claimed

9  assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v.*

10 *Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009) (citation omitted).

11     Prior to learning of Bromma and Entrust's apparent relationship with Avenatti, the Estate's

12 possible recovery of a significant sum from Avenatti was problematic.  However, considering that

13 Bromma is willing to put $1,000,000 on the line (with $500,000 in hard assets) for Avenatti and is

14 the owner and CEO of Entrust, it's not unreasonable to conclude that Bromma and Entrust have

15 (or at least had) possession, custody or control of Avenatti Assets – assets that may be used by the

16 Trustee as a recovery source for the EA Estate.  Reitman Dec., ¶ 5.

17     As EA was the main (and possibly the only) economic engine for Avenatti for the past

18 eight years, any Avenatti Assets placed with Bromma and Entrust may be the only source of

19 recovery from Avenatti directly to the EA Estate and its creditors.

20          **3.      The Balance of Equities tips in Favor of the Trustee.**

21     The balance of equities tilts in favor of the Trustee, on behalf of the EA Estate, due to the

22 potential irreparable loss of the Avenatti Assets.

23     Conversely, because Avenatti or the Avenatti Affiliates own the Avenatti Assets, Bromma

24 and Entrust have nothing to lose (other than any fees they may be able to charge for holding the

25 assets).  If they possess Avenatti Assets, they will be required to hold onto those assets until the

26 Marshal's Service can take possession of those assets via a pre-judgment writ of attachment.  If

27 they do not have any Avenatti Assets, they have nothing to be concerned about.

28

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   **4.      A Preliminary Injunction is in the Public Interest.**

2          The importance of the public interest analysis depends upon whether the requested

3   injunctive relief impacts non-parties to the lawsuit.  *See Stormans, Inc. v. Selecky*, 586 F.3d 1109,

4   1139 (9th Cir. 2009).  "When the reach of an injunction is narrow, limited only to the parties, and

5   has no impact on non-parties, the public interest will be at most a neutral factor in the analysis

6   rather than one that favors granting or denying the preliminary injunction."  *Id*. at 1138-39

7   (citations omitted).

8          The scope of the injunction requested by the Trustee is narrow – it is limited only to

9   Avenatti Assets (other than certain fully exempt property) in the possession, custody or control of

10  Bromma or Entrust, thus the public interest is not a major factor in the analysis.  However, even if

11  the Court were to consider this factor, it should conclude that the public is well served when

12  bankruptcy estates are able to protect the assets they are charged with marshalling – reaching any

13  other conclusion would ignore a significant purpose of bankruptcy protection.

14  Moreover, while Federal Rule of Civil Procedure 65(c) requires that a bond or security be posted

15  for the Court to issue a preliminary injunction, the Trustee is exempt from this requirement.

16  Federal Rule of Bankruptcy Procedure 7065 states that "Rule 65 F.R.Civ.P. applies in adversary

17  proceedings, **except that a temporary restraining order or preliminary injunction may be**

18  **issued on the application of a debtor, trustee, or debtor in possession without compliance**

19  **with Rule 65(c)**." (Emphasis added.)

20         **B.      The Court May and Should Grant A Right to Attach Order**

21         Federal Rule of Civil Procedure 64 (as incorporated by Federal Rule of Bankruptcy

22  Procedure 7064) provides:

23             At the commencement of and throughout an action, every remedy is available that,

24             under the law of the state where the court is located, provides for seizing a person or

25             property to secure satisfaction of the potential judgment . . . .

26  Fed. R. Civ. P. 64(a).

27         Among the claims for relief asserted against the Avenatti in the Complaint are several

28  claims for relief under the California Uniform Voidable Transfer Act (the "CUVTA"), California

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Civil Code § 3439, *et seq.*  Notably, the CUVTA provides for several "remedies of creditors" including "[a]n attachment or other provision remedy against the asset transferred or its proceeds in accordance with . . . Section 481.010 [of the California Code of Civil Procedure] . . . [and] [a]ny such other relief the circumstances require.  Cal. Civ. Code § 3439.07(a).

The procedure for obtaining a writ of attachment under California law on regular notice appears at California Code of Civil Procedure § 484.101, which provides that a "plaintiff may apply pursuant to this article for a right to attach order and a writ of attachment by filing an application for the order and writ with the court in which the action is brought."  A plaintiff may place a pre-judgment lien on certain property, including (but not limited to) investment accounts and money.  Cal. Code Civ. Proc. §§ 487.010, *et seq.*, 704.010, *et seq.*  Private retirement accounts are completely exempt, but self-employed retirement plans (IRA) are only conditionally exempt. Cal. Code Civ. Proc. § 704.115.   The Trustee does not seek to attach any completely exempt property, only property that is either (i) non-exempt or (ii) conditionally exempt.  Reitman Dec., ¶ 7.

The purpose of such a pre-judgment lien is to secure a potential money judgment against the defendant, and federal courts in California have experience with granting this pre-judgment remedy.  *See*, *Novus Optimum Labs v. Tamayo*, 2013 U.S. Dist. LEXIS 93116 (N.D. Cal. July 1, 2013) (issuing writ of attachment on regular notice); *Sunriver Trading Co. v. Double D Trade Co., LLC*, 2008 U.S. Dist. LEXIS 105932, 2-3 (E.D. Cal. Dec. 22, 2008) (issuing writ of attachment on *ex parte* basis).[4]

A party seeking a prejudgment attachment must demonstrate that (i) the claim upon which the attachment is based is one upon which an attachment may be issued; (ii) the plaintiff has established the probable validity of the claim upon which the attachment is based; (iii) the attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based; and (iv) the amount to be secured by the attachment is greater than zero.

---

[4] The requirements set forth by California Code of Civil Procedure §§ 484.090 and 485.220 are identical, save for the fact that an *ex parte* writ of attachment under § 485.220 requires that § 484.090 is fully met, along with an "irreparable harm" showing under § 485.010.

1    *Tamayo*, 2013 U.S. Dist. LEXIS 93116 at *26 (citing Cal. Code Civ. Proc. § 484.090(a)).

2    **1.    An Attachment May Be Issued on the Trustee's State Law Claims**

3    **Against Avenatti in the Amount of $25 million.**

4        As explained above, California Civil Code § 3439.07 establishes writs of attachment as a

5    pre-judgment remedy for claims arising under the CUVTA.  As the Trustee's Complaint asserts

6    claims under the CUVTA against Avenatti, the Trustee is entitled to seek a pre-judgment writ of

7    attachment.

8        Specifically, the Trustee has alleged that Avenatti is either the direct recipient or intended

9    beneficiary of $25 million in fraudulent and preferential transfers from EA in the seven years prior

10   to its petition date (September 13, 2019).  As a result of those transfers, until he was incarcerated

11   Avenatti maintained an extravagant (to the extreme) lifestyle at the expense of EA and its clients

12   (of whom several are creditors of the Estate).  It also both plausible and likely that some of those

13   funds were removed from EA and placed with persons like Bromma and Entrust for asset

14   protection purposes and may be attached by the Trustee.

15       In any event, the Court can and should allow the attachment of the Avenatti Assets under

16   California Civil Code §§ 3439.07(3)(C) and 3439.10, which provide for "[a]ny other relief the

17   circumstances may require" subject to applicable principles of equity which supplement the

18   CUVTA.  In this circumstance equity demands an attachment of the Avenatti Assets based on

19   Avenatti's conduct, as detailed above, as an attachment may be the only opportunity for the

20   Trustee to achieve a meaningful recovery against Avenatti for the benefit of the Estate's creditors.

21   Based on the Complaint and the claims for relief asserted against Avenatti, the amount of the

22   claim to be secured by the attachment of the Avenatti Assets should be no less than $25 million.

23   Reitman Dec., ¶ 6.  Therefore, the amount sought to be secured by the attachment is greater than

24   zero.  *Id.*

25   / / /

26   / / /

27   / / /

28   / / /

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Landau Law LLP
Attorneys at Law
Los Angeles, California

**2.      The Trustee Has Already Established the Probable Validity of its Claims against Avenatti and the Attachment Sought is Solely for the Purpose of Recovery Against Avenatti.**

The Trustee has already established the "probable validity"[5] of the Estate's claims against Avenatti.  *See supra* § II.A.1. and Adv. Docket No. 5.

Furthermore, the Trustee is not seeking an attachment of the Avenatti Assets for any reason other than to secure a potential future judgment against Avenatti.  Reitman Dec., ¶ 7. Based on Avenatti's proven fraudulent conduct and the numerous felony allegations pending against him as described above, the Trustee has good reason to believe that Avenatti and the Avenatti Affiliates have already taken and will continue to take steps to render themselves judgment proof as to the Trustee.  The *only* possible reason the Trustee could have in seeking an attachment of the Avenatti is to secure payment of a judgment against him.  *Id.*

**C.      The Court May and Should Waive the Undertaking Requirement of California Code of Civil Procedure § 489.210.**

California Code of Civil Procedure § 489.210 requires that "[b]efore the issuance of a writ of attachment . . . the plaintiff shall file an undertaking to pay the defendant any amount the defendant may recover for any wrongful attachment by the plaintiff fin the action."  The amount of the undertaking is, at minimum, $10,000, subject to increase by the court if the probable recovery for a wrongful attachment exceeds the amount of the undertaking.  *Id.* at § 489.220.

However, California's Bond and Undertaking Law (Cal. Code Civ. Proc. § 995.010, *et seq.*) governs the foregoing, and grants courts discretion to:

> [w]aive a provision for a bond in an action or proceeding and make such orders as may be appropriate if the bond were given, if the court determines that the [plaintiff] is unable to give the bond because the [plaintiff] is indigent and unable to obtain sufficient sureties . . . [i]n exercising its discretion the court shall take into consideration *all factors it deems relevant, including but not limited to the*

---

[5] A claim has "probable validity" under California law where "it is more likely than not that the plaintiff will obtain a judgment against the defendant on the claim."  Cal. Code Civ. Proc. § 481.190.

1    *character of the action or proceeding, the nature of the beneficiary* . . . and the

2    potential harm to the beneficiary if the provision for the bond is waived.

3    Cal. Code Civ. Proc. § 995.240 (emphasis added).

4        The Trustee is already exempt from the bond requirement for a preliminary injunction. *See*

5    Fed. R. Bankr. Proc. 7065.  Requiring the Trustee to post a bond for a $25 million writ of

6    attachment would (i) vitiate the purpose of Federal Rule of Bankruptcy Procedure 7065 and (ii)

7    make this exercise pointless as the Trustee, because the EA Estate lacks the funds to post any

8    bond, much less such a massive bond.  As the Court is aware from the Monthly Operating Reports

9    filed by the Trustee, the EA Estate currently has virtually no tangible assets and less than $10,000

10    available to it.  Reitman Dec., ¶ 8.

11        Given the history of this case, the prior receivership case, the concurrent criminal

12    proceedings (including the California Case allegations of Avenatti's misconduct in EA's 2017

13    bankruptcy case before this Court), the relief afforded by a right to attach order and writ of

14    attachment is necessary and should not be denied simply because the EA Estate is unable to post

15    sufficient security.  *See e.g., Van de Kamp v. Tahoe Regional Planning Agency*, 76 F.2d 1319,

16    1325 (9th Cir. 1985) (equitable principles permit a court to waive a bond requirement where

17    "requiring security would effectively deny access to judicial review.")  Accordingly, the Court

18    may and should exercise its discretion under California Code of Civil Procedure §995.240 and

19    waive the undertaking requirement of California Code of Civil Procedure § 489.210

20    **III.**    **CONCLUSION**

21        For all the foregoing reasons, the Trustee respectfully requests that the Court grant the

22    Motion and issue a preliminary injunction enjoining and restraining Bromma and Entrust, and

23    each of their respective controlled entities, agents, servants, employees, and attorneys, and others

24    acting in concert or participating with any of them, from directly or indirectly assigning,

25    dissipating, distributing, encumbering, hypothecating, moving, pledging, selling, transferring, or

26    otherwise disposing of any Avenatti Assets or any interests therein, without further leave of Court

27    / / /

28    / / /

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 or the written consent of the Trustee.  The Trustee further requests that the Court issue a pre-

2 judgment writ of attachment to be placed on the Avenatti Assets in the possession, custody or

3 control of Bromma or Entrust.

4

5 Dated:  April 16, 2020                                    Respectfully submitted,

6                                                                          LANDAU LAW LLP

7

8 By:_____/s/ Jack A. Reitman_____
                                                                             Jack A. Reitman

9 Special Litigation Counsel for Richard A. Marshack,
   Chapter 7 Trustee for Eagan Avenatti, LLP

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

### DECLARATION OF JACK A. REITMAN

2  I, Jack A. Reitman, declare as follows:

3       1.      Except as otherwise stated below, I have personal knowledge of the facts set forth

4  herein and, if called as a witness, I could and would testify competently thereto under oath.  I am

5  an attorney at law licensed to practice in the State of California and admitted to practice before

6  this Court.  I am an associate with the law firm of Landau Law LLP, special litigation counsel for

7  Richard A. Marshack, chapter 7 trustee (the "Trustee") of the bankruptcy estate of Eagan Avenatti

8  LLP ("EA") and formerly counsel to Brian Weiss, formerly the Court Appointed Receiver (the

9  "Receiver") of the Receivership Estate of Eagan Avenatti, LLP.  I make this declaration in support

10  of the Trustee's emergency motion for a preliminary injunction and pre-judgment writ of as to any

11  and all property of Michael J. Avenatti ("Avenatti") or his affiliates (the "Avenatti Affiliates")[6]

12  (the "Avenatti Assets") currently in possession, custody or control of Hubert Bromma

13  ("Bromma") or The Entrust Group ("Entrust").

14       2.      Based on my review of court filings in *U.S. v. Avenatti,* 1:19-cr-373-PGG (the

15  "Extortion Case"), pending in the United Stated District Court for the Southern District of New

16  York, I am informed and believe that on February 14, 2020 the jury in that case found Michael

17  Avenatti (Avenatti) guilty on all three counts with respect to his attempted extortion of Nike, Inc.

18  The court filings I reviewed also indicate that sentencing is set for June 17, 2020.

19       3.      I am on the service list and receive pleadings filed in *U.S. v. Avenatti*, 8:19-cr-

20  00061-JVS (the "California Case"), currently pending in the United States District Court, Central

21  District of California, Santa Ana Division. My review of documents electronically served on me in

22  that case show the following:  On March 26, 2020, Avenatti filed a Motion for Reconsideration of

23  Bail Pending Trial, citing concerns regarding the COVID-19 pandemic (California Case, Docket

24  _____

25  [6] "Avenatti Affiliates" means any one or more of Michael Avenatti; Michael Avenatti, Esq.; Michael J. Avenatti;
Augustus, LLP; Avenatti, LLP; Avenatti & Associates; Avenatti & Associates, APC; Michael Avenatti Trust; Desert
26  Harvest, LLC; Desert Harvest Development LLC; Double Down, LLC; Doppio, Inc.; GB Autosport LLC; Global
Baristas US, LLC; Global Baristas, LLC; MJA Esq.; Nero; Passport 420 LLC; Trial Lawyers; The Trial Group, LLC;
27  Tyrian Systems, LLC; We're Still Here, LLC; 21923 Parthenia St., LLC; any predecessor or successor in interest to
any of the foregoing; and any other person identified by Avenatti or any of the above-identified Avenatti Affiliates to
28  Bromma or Entrust as controlled by Avenatti or an Avenatti Affiliate.

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

No. 125) ("First Motion for Reconsideration").  In this First Motion for Reconsideration, Bromma

was offered as the source of a $300,000 bond for the temporary release of Avenatti.  The First

Motion for Reconsideration was denied on March 27, 2020, and a second motion for

reconsideration (the "Second Motion for Reconsideration") was filed on March 30, 2020, which

also mentioned Bromma.

4.      My review of filings in the California Case also show that on April 4, 2020, before

the Second Motion for Reconsideration could be ruled upon, Avenatti filed a second *ex parte*

application for reconsideration of bail pending trial (the "Second *Ex Parte* Application"), a true

and correct copy of which is attached as Exhibit 1.  That application states that Mr. Bromma (i) is

willing to sign a $1,000,000 signature bond for Avenatti's release and (ii) is placing real property

in San Luis Obispo worth at least $500,000 as surety for Avenatti's bond.  Ex. 1, 2:11-16 and 8:7-

10.  The Second *Ex Parte* Application was granted on April 7, 2020.

5.      Prior to learning of Bromma and Entrust's apparent relationship with Avenatti,

based on my review of the information available to Landau Law LLP and my discussions with

other members of the firm working on the EA bankruptcy case, I and those other attorneys had

concluded that Estate's possible recovery of a significant sum from Avenatti was problematic.

However, considering that Bromma is willing to put $1,000,000 on the line (with $500,000 in hard

assets) for Avenatti and is the owner and CEO of Entrust, those attorneys and I believe that it is

not unreasonable to conclude that Bromma and/or Entrust have (or at least had) possession,

custody or control of Avenatti Assets – assets that may be used by the Trustee as a recovery source

for the EA Estate.

6.      The Landau Law attorneys (including myself) working on the EA case also believe

that an attachment may be the only opportunity for the Trustee to achieve a meaningful recovery

against Avenatti for the benefit of the Estate's creditors.  Based on the Complaint and the claims

for relief asserted against Avenatti, the amount of the claim to be secured by the attachment of the

Avenatti Assets should be no less than $25 million.  Therefore, the amount sought to be secured

by the attachment is greater than zero.

7.      The attachment sought by Landau Law on behalf of the Trustee is not sought for a

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  purpose other than to secure payment of the Trustee's possible money judgment against the

2  Avenatti.  As of this date, I have no information or belief that the Trustee's claims against

3  Avenatti have been discharged in a proceeding under Title 11 of the United States Code or that

4  that prosecution of this action is stayed in a proceeding under Title 11 of the United States Code.

5  The attachment sought by Landau Law on behalf of the Trustee does not seek to attach any

6  completely exempt property, only property that is either (i) non-exempt or (ii) conditionally

7  exempt.  *See* Cal. Code Civ. Proc. §§ 487.010, *et seq.*, 704.010, *et seq*.

8         8.      The Estate has no ability to post a bond, as the total amount of assets immediately

9  available to it is less than $10,000.  This has been the case since the Receiver took control of EA

10 in February 2019.

11        I declare under penalty of perjury that the foregoing is true and correct.

12        Executed on April 16, 2020, at Los Angeles, California

13

14                                   /s/ Jack A. Reitman
                                        Jack A. Reitman

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Landau Law LLP
Attorneys at Law
Los Angeles, California

EXHIBIT 1

H. Dean Steward  SBN 85317
107 Avenida Miramar, Ste. C
San Clemente, CA 92672
949-481-4900
Fax: (949) 496-6753

Attorney for Defendant
Michael J. Avenatti

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>                  Plaintiff,<br><br>            vs.<br><br>MICHAEL J. AVENATTI<br><br>            Defendant. | Case No. SA-CR-19-61-JVS<br><br>**SECOND** EX PARTE APPLICATION FOR RECONSIDERATION OF BAIL PENDING TRIAL; POINTS AND AUTHORITIES; DECLARATION OF COUNSEL; EXHIBITS<br>[Proposed] ORDER |

Comes now defendant Michael J. Avenatti, together with counsel, and applies to this Court ex parte for an order re-admitting him to bail pending trial, forthwith, with a number of conditions. This application is based on the below points and authorities, declaration and exhibits.

Dated: April 4, 2020        /s./ H. Dean Steward
                            H. Dean Steward
                            Counsel for Defendant
                            Michael J. Avenatti

- 1 -

EXHIBIT 1
18

POINTS AND AUTHORITIES

I. BACKGROUND

Defendant sought bail pending trial (reconsideration of an earlier detention order) on March 26, 2020 [docket #125]. This Court granted bail, but set a number of conditions, most conditions above what the defense had suggested. (See transcript of file, 3-31-20, docket #132). The defense has since diligently worked to fulfill each condition imposed by the Court.

Currently, a property bond in the amount of $500,000 has begun the process of appraisal and documentation. In addition, surety Hubert Bromma is prepared to sign a signature bond in the amount of $1,000,000. Pre-Trial Services has been provided with contact information for both the surety and the third-party custodian and has been requested to interview both and report back to the Court and counsel.

Because the situation is more dire now at the MCC in New York City, the defense has requested reconsideration of the Court's prior order to include forthwith release with conditions suggested below. *U.S. v. Chen* 820 F. Supp. 1205,1211-12 (N.D. CA. 1992),("The changed circumstances support reconsideration of [defendant's] status as well.").

II. MCC NEW YORK CITY HAS GROWN ALARMINGLY MORE DANGEROUS SINCE THE FIRST APPLICATION FOR RECONSIDERATION FOR BAIL PENDING TRIAL

Up until yesterday, the MCC in New York City has reported 4 inmate cases of covid 19 and 5 staff members have tested positive. [See Ex. "A"]. Importantly, however, the MCC in New York City has no more coronavirus test kits.

- 2 -

EXHIBIT 1
19

1
2
3
4
5
6
7

"A federal detention center at the epicenter of the coronavirus pandemic in New York City has no in-house ability to test sick or high-risk inmates for covid 19, according to a letter from the jail's top official in court documents reviewed by ABC News. 'MCC New York does not have covid 19 tests', M. Licon-Vitale, the recently installed warden of the Metropolitan Correctional Center in downtown Manhattan, wrote in a letter to a federal judge this week."

8
9
10
11
12

J. Hill & L. Barr, *No COVID 19 Tests Available for prisoners at Center of New York Outbreak, Court Documents Show* ABC News, 4-4-20 https://abcnews.go.com/Health/covid-19-tests-prisoners-center-york-outbreak-court/story?id=69969077 [Attached Ex. "B"]

13
14
15
16
17
18

As such, the facility has no idea how many inmates or staff are infected. Indeed, Law.Com reports that only a total of 7 inmates at the MCC, as of today (7 at MCC, 5 more at MDC in Brooklyn), have been covid 19 tested. T. McParland, *NYC Federal Lockups, in Court-Mandated report, Said Only 12 Inmates Have Gotten COVID Tests,* Law.Com/ New York Law Journal, 4-4-20; attached as Ex "__".

19
20
21
22
23

Without question, this stunning condition imperils all inmates and staff at the facility, including Mr. Avenatti. Indeed, as the defense has argued earlier, Mr. Avenatti is particularly susceptible to any lung infection/virus, from his bout with pneumonia late last year.

24
25
26
27
28

The defense has learned of the following recent cases where release has been granted to defendants due to the covid 19 pandemic:
/
/

- 3 -

EXHIBIT 1
20

Southern District of New York:

• *U.S. v. Resnick,* SDNY 1:12-cr-00152CM (Dkt No. 461): April 2, 2020 order releasing MCC inmate to home confinement "notwithstanding the mandatory 14-day quarantine period." Court found the quarantine at MCC "would subject him to "additional unnecessary risk." Case discusses compassionate release of a sentenced prisoner under 18 USC §3582. [Attached as Ex "C"].

• *US v. Hernandez*, SDNY 19-cr-169VM (Dkt Nos. 163 and 166): April 1, 2020 order ending quarantine so inmate can be released for electronic monitoring; March 30, 2020 order releasing inmate directly from MCC to home confinement. Inmate's bail was previously denied because of nine prior criminal convictions.

• *US v. Corcino*, SDNY 1:19-cr-901 (Dkt. No. 14): March 27, 2020 order releasing MCC inmate to home confinement without further quarantine or COVID-19 testing. Defense and the court addressed the issue as "pre-trial compassionate release". (Dkt No. 14, p. 1) and that release was granted under "stringent conditions". *Id,* p. 2.

Eastern District of New York

• *Us v. Eli*, EDNY 1:20-cr-00050RJD (Doc. Nos. 29, 30 and 32): March 25, 2020 order releasing MDC inmate without quarantine. *Order under seal.*

Southern District of Texas

• *US v. Mace*, SDTX 4:17-cr-00618 (Dkt Nos. 56 and 57): April 1, 2020 order releasing defendant from BOP facility without further quarantine or COVID-19 testing. Sentence reduced to time served to avoid further incarceration in light of pandemic.

/

/

- 4 -

EXHIBIT 1
21

III. QUARANTINE

The Federal Bureau of Prisons imposed a nationwide 14-day quarantine on all prisoners on March 31, 2020 (See attached Ex. "D"].[1] However, it does virtually nothing to address: 1) pre-symptomatic inmate spread (BOP only started quarantining asymptomatic new arrivals on March 26); 2) jail churn (staff keep coming in, contractors keep coming in, inadequate screening of both); 3) numerous exceptions to the lockdown; 4) inadequate sanitation & preventive measures (e.g. no masks, no gloves); and 5) and at the MCC in New York City, no testing or contact tracing at all. The quarantine can have little effect, due to these issues.

In the case at hand, continued confinement subjects Mr. Avenatti to potentially deadly, unnecessary risks. In addition, the district court in the four cases cited above released the defendants with no BOP testing or further quarantine.

IV. DEFENDANT DOES NOT NEED TO BE TESTED:

According to the ABC News report above, the MCC in New York City lacks the ability to test inmates. Mr. Avenatti does not need and cannot be tested at this point. There is also a nationwide shortage of test kits swabs and required reagent. The likelihood of the Bureau of Prisons getting any priority in acquiring test kits is remote.

"Not everyone needs to be tested for COVID-19," according to the CDC. Only patients with severe symptoms. https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html. Tests are rationed in every state. Many symptomatic patients don't even get them unless their symptoms meet certain severity

---

[1] Mr. Avenatti's unit at MCC, 11 South, has actually been under quarantine since March 23, as the first suspected covid 19 case was an inmate from that unit. His 14 days will actually expire April 6, 2020. See attached declaration.

- 5 -

EXHIBIT 1
22

1  thresholds. https://www.npr.org/2020/04/03/826044608/many-who-need-testing-for-

2  covid-19-fail-to-get-access. And again, the four cases above involved inmate releases

3  with no further "out-the-door" testing.

4

5  V. IF IMMDICATE RELEASE IS GRANTED, REQUESTED BAIL CONDITIONS

6        If the Court considers immediate release, the defense suggests the following

7  ramped-up conditions from previous suggestions:

8

9  1. Immediate release for 90 days after defendant and a responsible, Pre-Trial Services

10  approved surety have signed and filed a signature bonds in the amount of $1,000,000.

11  No further quarantine or testing will be required before release.

12

13  2. Posting of property with proven equity of $500,000 by April 20, 2020- (See

14  Declaration of Counsel re the current logistical difficulties in posting a property bond).

15

16  3. Release only to an officer the court (defense attorney), for immediate transportation

17  to Newark, La Guardia or JFK airports. Then counsel and defendant shall fly to Los

18  Angles, and counsel shall transport defendant to the home of third-party custodian Jay

19  Manheimer.

20

21  4. Defendant shall be under home detention, electronic monitoring and shall not leave

22  the premises except for medical emergencies, in such case with immediate notification

23  to Pre-Trial Services.

24

25  5. Defendant shall not have access to any electronic devices.

26

27  6. Such further conditions as the Court may impose.

28  /

- 6 -

EXHIBIT 1
23

VI. CONCLUSION

        Because of changed circumstances and deteriorating conditions at the MCC in
New York City, the defense asks the Court to consider setting bond as suggested
above. Defendant remains medically "at risk" at the MCC due to his previous health
issues, and release is necessary to avoid disastrous health consequences.


Dated: 4-4-20          /s./ H. Dean Steward
                       H. Dean Steward
                       Counsel for Defendant
                       Michael J. Avenatti

- 7 -

EXHIBIT 1
24

DECLARATION OF COUNSEL

I, H. Dean Steward, declare:

1. I am retained counsel for defendant Michael J. Avenatti. I make this declaration in support of the attached second ex parte application for bond pending trial.

2. I have talked with surety Hubert Bromma and third party custodian Jay Manheimer. Mr. Bromma has offered a piece of property that he owns in San Luis Obispo, California as surety for $500,000 in real property equity.

3. I have retained Bail Bond Professionals [BBP] of Tustin, California to assist me in the preparation of all documents regarding the property bond, then walk them through the required approvals. I have been informed by a representative of BBP that what normally taken 3-4 days to accomplish in the process of posting a property bond, now takes two weeks. This is due to closed clerk's offices (both federal court and county clerk), difficulty in hiring an appraiser to go to and review the property, and a general slowdown is each step of the process. For example, Mr. Bromma lives in the Northern District of California. Normally, he would go to the U.S. Attorney's office in San Francisco for surety bond review and approval. That office is currently closed.

4. The statements in the attached second ex parte for bail pending trial are true to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4-4-20        /s./ H. Dean Steward

- 8 -

EXHIBIT 1
25

CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age.

My business address is 107 Avenida Miramar, Ste. C, San Clemente, CA 92672.

    I am not a party to the above entitled action. I have caused, on  4-4-20, service

of the defendant's:

**Second MOTION FOR RECONSIDERATION OF BAIL PENDING TRIAL**

On the following party, using the court's ECF system:

**AUSA BRETT SAGEL AND JULIAN ANDRE**

_____

**AND BY E-MAIL ON**

**PRE-TRIAL SERVICES OFFICER SHAKIRA DAVIS**

_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 4-4-20

s/ H. Dean Steward

H. Dean Steward

H. Dean Steward  SBN 85317
107 Avenida Miramar, Ste. C
San Clemente, CA 92672
949-481-4900
Fax: (949) 496-6753

Attorney for Defendant
MICHAEL J. AVENATTI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES, | Case No.  SA-CR-19-61-JVS |
| Plaintiff, | [Proposed] ORDER |
| vs. | |
| MICHAEL J. AVENATTI | |
| Defendant. | |

A sufficient showing having been made, it is ordered that defendant Michael J. Avenatti shall be released from custody of the following terms and conditions:

1. Immediate release for 90 days after defendant and a responsible, Pre-Trial Services approved surety have signed and filed signature bonds in the amount of $1,000,000. No further quarantine or testing will be required before release.

2. Posting of property with proven equity of $500,000 by April 20, 2020.

3. Release only to an officer the court (defense attorney), for immediate transportation to Newark, La Guardia or JFK airports. Then counsel and defendant shall fly to Los

- 1 -

EXHIBIT 1
27

1   Angles, and counsel shall transport defendant to the home of third-party custodian Jay

2   Manheimer.

3

4   4. Defendant shall be under home detention, electronic monitoring and shall not leave

5   the premises except for medical emergencies, in such case with immediate notification

6   to Pre-Trial Services.

7

8   5. Defendant shall not have access to any electronic devices.

9

10

11  So ordered.

12

13  Dated: April __, 2020  _____

14                              Hon. James V. Selna

15                              U.S. District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

EXHIBIT 1
28

A-Z Topics    Site Map    FOIA

Search bop.gov

| Home | About Us | Inmates | Locations | Careers | Business | Resources | Contact Us |



The Bureau of Prisons (BOP) is carefully monitoring the spread of the COVID-19 virus. As with any type of emergency situation, we carefully assess how to best ensure the safety of staff, inmates and the public.

BOP COVID-19 Modified Operations Plan

### BOP's Emergency Response

Every institution is like a small city and to cope with major emergencies or other significant interruptions of normal operations, they each have continuity of operations (COOP) plans that provide guidance to staff.

### BOP's COVID-19 Response

In February 2020, the BOP's Public Health Service (PHS) staff were placed in operational dress uniforms to be ready to respond to COVID-19 incidents by the Assistant Secretary for Health.

### BOP's COVID-19 Collaboration Efforts

BOP PHS Officers have been deployed for national travel-related screening at airports and NIC has been asked to share BOP-related guidance with state and local corrections.

### Coronavirus.gov

The primary lane of information for the public regarding Coronavirus (COVID-19) is a portal for public information published by the Coronavirus (COVID-19) Task Force at the White House, working in conjunction with CDC, HHS and other agency stakeholders.

### CDC.gov

The Centers for Disease Control and Prevention (CDC) has established a resource portal on CDC.gov with the latest information from CDC and the overarching medical community on COVID-19.

### USA.gov

To learn about international travel restrictions, how you can prepare for coronavirus, and what the U.S. government is doing in response to the virus, visit https://www.usa.gov/coronavirus

EXHIBIT "A"

EXHIBIT 1
29

# Open COVID-19 Tested Positive Cases

Inmates

**91**

**(Inmate) 4/03/2020 -** USP Atlanta (5); MDC Brooklyn; FCI Butner Low (7); FMC Butner; FCI Butner Medium I (3); USP Canaan; FCI Danbury (20); FCI Elkton (2); FCI Forrest City Low (2); USP Lompoc (14); MCC New York (4); FCI Oakdale I (18); FCI Otisville; FCI Yazoo City Medium (4); FCI Yazoo City Low; RRC Brooklyn, NY (4); RRC Janesville, WI; RRC Phoenix, AZ; FLM Guam.

**(Staff) 4/03/2020 -** Atlanta, GA (3); Brooklyn, NY (4); Butner, NC; Canaan, PA; Chicago, IL (3); Danbury, CT (6); Lisbon (Elkton), OH; Forrest City, AR; Leavenworth, KS (no inmate contact); Lompoc, CA (2); Milan, MI; New York, NY (5); Oakdale, LA (4); Otisville, NY; Ray Brook, NY (6); Talladega, AL (3); Tucson, AZ; Yazoo, MS (3); Central Office, Washington, DC; Grand Prairie Office Complex, Grand Prairie, TX; Southeast Regional Office, Atlanta, GA.

Staff

**50**

***Note:*** *Due to the rapidly evolving nature of this public health crisis, the BOP will update this dashboard daily at 3:00 p.m. based on the most recently available data from across the agency as reported by the BOP's Office of Occupational Health and Safety.*

## Resources

- COVID-19 Visitor/Volunteer/Contractor Screening Tool

- COVID-19 Inmate Screening Tool

- COVID-19 Staff Screening Tool

- Coronavirus (COVID-19) Precautions/Modified Operations for Residential Reentry Centers.

- Coronavirus (COVID-19) Religious Accommodations

| **About Us** | **Inmates** | **Locations** | **Careers** | **Business** | **Resources** | **Resources For ...** |
|---|---|---|---|---|---|---|
| About Our Agency | Find an Inmate | List of our Facilities | Life at the BOP | Acquisitions | Policy & Forms | Victims & Witnesses |
| About Our Facilities | First Step Act | Map of our Locations | Explore Opportunities | Solicitations & Awards | News Stories | Employees |
| Historical Information | Communications | Search for a Facility | Current Openings | Reentry Contracting | Press Releases | Federal Executions |
| Statistics | Custody & Care | | Our Hiring Process | | Publications | Former Inmates |
| | Visiting | | | | Research & Reports | Media Reps |
| | Voice a Concern | | | | | |

Contact Us | FOIA | No FEAR Act | Privacy Policy | Information Quality | Website Feedback
USA.gov | Justice.gov | Open Government

https://www.bop.gov/coronavirus/                                                              2/3

EXHIBIT 1
30

4/4/2020
No COVID-19 tests available for prisoners at center of New York outbreak, court documents show - ABC News

 CORONAVIRUS GOVERNMENT RESPONSE

# No COVID-19 tests available for prisoners at center of New York outbreak, court documents show

*"Please help me before I die," one inmate said via his attorney.*

By James Hill and Luke Barr

April 4, 2020, 3:00 AM • 14 min read



**One of the largest single-site jails in the US grapples with 134 coronavirus cases**



*The WHO has now declared the virus, aka COVID-19, a pandemic.*

A federal detention center at the epicenter of the coronavirus pandemic in New York City has no in-house ability to test sick or high-risk inmates for COVID-19, according to a letter from the jail's top official in court documents reviewed by ABC News.

"MCC New York does not have COVID-19 tests," M. Licon-Vitale, the recently installed warden of the Metropolitan Correctional Center in downtown Manhattan, wrote in a letter to a federal judge this week.

The warden's letter came in response to an order from U.S. District Court Judge Paul Engelmayer to test an MCC inmate in his 20s who claimed to be experiencing novel coronavirus symptoms and believed he might have contracted it.

"He was placed into quarantine yesterday after he developed symptoms of COVID-19, including a cough and body aches," wrote Florian Miedel, a defense attorney appointed to represent Bryant Brown, who's awaiting trial on murder charges. "We are concerned about MCC's ability to care for Mr.



EXHIBIT "B"

https://abcnews.go.com/Health/covid-19-tests-prisoners-center-york-outbreak-court/stor...

EXHIBIT 1

31

Brown, given its track record over the years with other clients under less trying circumstances."



📷 *Inmates walk through the exercise yard at California State Prison Sacramento, near Folsom, Calif., Feb. 26, 2013.*
Rich Pedroncelli/AP, FILE

Miedel sought the court-ordered test this week to ensure Brown was receiving appropriate care and asked the court to order the facility to provide frequent updates on his condition.

Licon-Vitale wrote in response that the facility's doctor and an infectious disease specialist from the Bureau of Prisons had determined Brown's symptoms did not meet the criteria for testing based on guidelines from the Centers for Disease Control and Prevention, which have prioritized testing for health care workers and for patients exhibiting high fever and acute respiratory symptoms.

+ MORE: Kentucky health officials beef up orders for rogue coronavirus patients

Transporting Brown to a hospital "would be ill-advised and expose him to others who are symptomatic for a test that an Infectious Disease Specialist advised is not needed," Licon-Vitale wrote.

At MCC, a source familiar with the facility's operations told ABC News that staffers face severe shortages of proper personal protective equipment, or PPE.

The BOP did not immediately respond to a request for comment about the situation at MCC.

"COVID-19 and the lack of readiness by the Federal Bureau of Prisons has made an already very dangerous working environment into hell for our staff -- both physically and mentally," Tyrone Covington, the correctional officers' local union representative, told ABC News. "It is a daily war to keep the inmate population in line as they demand visits with their families and fear for their health and their families' health."

EXHIBIT 1
32



Stock photo: Prison
Stock photo/Getty Images

As the COVID-19 pandemic has spread throughout the United States, health officials, attorneys and prison workers at both the state and federal level have been sounding alarms for weeks about the dangers a COVID-19 spread present to inmates and staff.

At a coronavirus task force briefing earlier this week, President Donald Trump said he "doesn't like" the idea of states releasing nonviolent offenders.

"We are looking to see if I have the right to stop it in some cases," the president said.

> + MORE: Supreme Court scraps April calendar, delays major cases amid
> pandemic

At Federal Correctional Institution Oakdale in Louisiana, four inmates have died from COVID-19, and nationally at least 50 staff and 91 inmates have tested positive, according to the Bureau of Prisons, which confirmed to ABC News that FCI Oakdale inmates showing symptoms wouldn't be tested because tests are too scarce.

"As is typical practice in facilities with sustained transmission of COVID-19, local health authorities have recommended against testing additional cases who present with COVID-19 symptoms in the Oakdale facility, but to presume they are COVID-19 positive. This action is in order to conserve valuable testing resources," the facility said in a statement.

In a Friday night memo to the director of the Bureau of Prisons, Attorney General William Barr called for the "appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, LA , FCI Danbury, CT, FCI Elkton, OH and other similarly situated BOP facilities where COVID-19 is materially affecting operations."

EXHIBIT 1
33

Barr said that like any precautions, some "have not been perfectly
successful at all institutions."

The attorney general said that the transfer of inmates would occur on a
"case-by-case" basis following a 14-day quarantine at a BOP facility. The AG
said that he authorizes home confinement even if electronic monitoring
isn't available.



Mt. Sinai medical workers hold up photos of medical workers who have died from the coronavirus
during a protest on April 3, 2020 in New York City.
Stephanie Keith/Getty Images

MCC in New York, which has about 700 inmates, has reported at least nine
confirmed cases of COVID-19 among inmates and staff, according to the
federal Bureau of Prisons.

The facility has been mired in controversy for months following the apparent
suicide of convicted sex offender Jeffrey Epstein. In late February, there
was a two-week lockdown after authorities found a loaded gun in an
inmate's cell. Licon-Vitale took over the top spot at MCC in January, after
the previous warden was removed after Epstein's death.

Another federal judge in Manhattan, Katherine Polk Failla, received a
similar response from the MCC after Miedel sought a test for another client,
Clifford Taylor, a 69-year-old inmate seeking a temporary release to home
confinement for the duration of the pandemic.

In a brief note entered in court records on Thursday, Failla wrote that she'd
spoken to the in-house lawyer at MCC and was told "MCC has no on-site
COVID-19 testing capabilities" and there were "many practical
impediments at this time to removing Mr. Taylor from the MCC and
transporting him to a facility where he could be tested."

Faced with those facts, Failla declined to order Taylor tested.

+ MORE: 11 states have yet to issue formal stay-at-home orders amid coronavirus

"They're telling us that they don't do COVID-19 testing in the MCC," Miedel
said. "So the only way that people can be tested is if they are taken out of

the facility to a hospital and tested there."

Miedel told ABC News his client has underlying medical conditions,
including a history of hypertension and kidney disease, and presently had
been quarantined in a dorm-like setting on the 11th floor of MCC, along
with other high-risk inmates. Taylor is asymptomatic, Miedel said, but he
asked for the test because the person Taylor intends to stay with, if granted
temporary release, sought assurances Taylor had tested negative.

"The judge preliminarily agreed to release him temporarily. We were
working out the logistics of that release. And then the person that he was
going to live with basically said, 'Look, I don't want him to come live with
me unless I know it's clear,' which makes sense," Miedel said. "I am
seriously concerned that the longer Mr. Taylor remains in the unit, the
greater the chance that he will contract the virus."

At MCC, one of the first confirmed cases of COVID-19 was an inmate who,
as part of a gun investigation, was transferred to FCI Otisville in upstate
New York and then transferred back to MCC, sources familiar with the
situation told ABC News.



VIDEO    LIVE    SHOWS    2020 ELECTIONS    CORONAVIRUS



*Medical workers approach a refrigerator truck being used as a morgue outside of Brooklyn Hospital Center amid the coronavirus pandemic on April 3, 2020, in New York.*
Stephanie Keith/Getty Images

The process of moving inmates around is still going on, according to
Congressman Fred Keller, R-Pa.

"Our stance is, stop it immediately. It's certainty in their power. It's their
institutions," Keller, who has two BOP facilities in his district, told ABC
News in an interview.

Keller said he's talked to the Bureau and left "no stone unturned" in trying
to halt inmate movement.

The Bureau said it was still moving inmates because of ongoing court
proceedings. Other U.S. courts have taken precautions to limit inmate
movement, such as a switch to virtual hearings in the Southern District of
New York.

EXHIBIT 1
35

At another federal jail in New York, the Metropolitan Detention Center in Brooklyn, four inmates with underlying health issues filed a civil lawsuit last week against the warden, alleging the facility is so ill-equipped to contain the virus that continuing to detain high-risk prisoners violates their constitutional rights.

An unnamed MDC prisoner was quoted by his attorney in court records that "things are very bad here."

"There are approximately 90 people in a small area, and we are freaking out and are not doing well mentally," the inmate continued in the court filing. "[W]e cannot get any information or anyone to listen to us. ... Please help me before I die."

There are approximately 1,700 inmates at MDC, and, according to the lawsuit, 537 of them are classified by BOP as vulnerable to COVID-19 using CDC guidelines, based on their age and existing health conditions.

+ MORE: Trump denies 'massive recession' even as his top economic adviser warns of 'terrible' economic numbers

Attorneys for the four prisoners have asked a federal judge to release them immediately because the typical processes for seeking compassionate release from BOP have been mired in delays.

The threat to the inmates' lives "is ongoing, not simply imminent," the lawsuit states. "Every hour that [they] are held in the MDC, they are at a significantly elevated risk of contracting coronavirus, and because of their age and/or medical conditions, their risk of dying from coronavirus is significant."

Government attorneys representing the institution's warden, Derek Edge, argued that protocols put in place by the Bureau of Prisons this week make it unnecessary for the court to intervene.

"There is no allegation that Petitioners themselves are in need of urgent medical care. Nor is there any basis to believe that, even if they were in need of medical care, they would be unable to receive such treatment while still incarcerated," wrote Jason Cho, an assistant U.S. attorney, who also noted that his office and the BOP are working with federal public defenders on the cases of 11 inmates who believe they're eligible to be released to home confinement.

The latest phrase of BOP's COVID-19 plan, implemented this week, restricts inmates to their assigned cells, with limited exceptions, for the next two weeks to decrease the spread of the virus. The bureau also said it's working with U.S. Marshals to significantly decrease incoming movement at facilities.

"BOP and MDC have taken strong measures to reduce the risk of COVID-19 for inmates and have reduced inmate populations, increased sanitation and screening, limited visitors, increased testing and improved isolation protocols," Cho wrote.

EXHIBIT 1
36

*Tune into ABC at 1 p.m. ET and ABC News Live at 4 p.m. ET every weekday
for special coverage of the novel coronavirus with the full ABC News team,
including the latest news, context and analysis.*

The MDC has tested just seven of the 1,700 inmates at the facility, according
to court filings, with three of those testing positive.

U.S. District Court Judge Rachel Kovner, who's overseeing the MDC case,
ordered the parties in the case to try to reach a negotiated settlement to the
litigation by the end of the day Friday.

But according to court filings late Friday evening, the attempts at
mediating the dispute have been unsuccessful thus far.

MDC officials informed attorneys for the four inmates that their request to
BOP for compassionate release had been rejected, according to court
documents. In a letter to one inmate's lawyer, which was attached to the
court filings, Warden Edge wrote that the inmate failed to meet the criteria
for release because there had not been "any significant changes to his
medical conditions to reflect a terminal or debilitated medical condition."

That decision was immediately blasted by the lawyers for the inmates, who
renewed their request for the judge to order the inmates' immediate release
in order to protect them from the virus.

"A process that requires vulnerable people to remain in hazardous
conditions and wait until they contract a potentially lethal disease before
they are eligible for release from that threat is no credible alternative,"
wrote Katherine Rosenfeld, an attorney for the inmates.

**What to know about coronavirus:**

- *How it started and how to protect yourself:* **Coronavirus explained**

- *What to do if you have symptoms:* **Coronavirus symptoms**

- *Tracking the spread in the U.S. and worldwide:* **Coronavirus map**

💬 Comments (13)                                    f  🐦  ✉

abcNEWS

EXHIBIT 1
37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————x

UNITED STATES OF AMERICA

              V.                             14 CR 810 (CM)

MARK RESNICK,

              Defendant.

———————————————————————x

       DECISION AND ORDER GRANTING MOTION FOR COMPASSIONATE RELEASE

McMahon, C.J.:

      On October 7, 2013, following a twelve-day jury trial, Mark Resnick and his two co-

defendants, Michael Binday and James Kergil, were found guilty of conspiracy to commit mail

and wire fraud, in violation of Title 18, United States Code, Section 1349; mail fraud, in

violation of Title 18, United States Code, Section 1341; and wire fraud, in violation of Title 18,

United States Code, Section 1343, in connection with a scheme to defraud insurance companies

which the defendants purported to serve as agents. Resnick and Kergil were also found guilty of

conspiring to obstruct justice through destruction of records, in violation of Title 18, United

States Code, Section 1512(k).

      On July 30, 2014, this Court sentenced Binday to 144 months' imprisonment; Kergil

to 108 months; and Resnick to 72 months, along with three-year terms of supervised release

for each defendant, and substantial forfeiture and restitution. On October 26, 2015, the

Second Circuit affirmed the convictions and sentences of Resnick and his co-defendants,

directing only a limited remand, at the Government's request, for entry of an amended

1

EXHIBIT "C"

EXHIBIT 1
38

restitution order in a reduced amount of $37,433,914.17.

Resnick surrendered on July 6, 2016 to begin his term of imprisonment; he has to date served approximately three years and nine months of his six-year sentence. According to BOP's sentence monitoring computation data, as of March 19, 2020, Resnick's projected release date is October 7, 2021, reflecting good-time credit. Computation data from FMC Devens, where he is being held, establishes that as of March 19, 2020, he has served 61.7% of his term of imprisonment.

Before the Court is Resnick's Emergency Motion asking the Court to grant him Compassionate Release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), or to release him to home confinement, allowing him to serve the remainder of his sentence at home. ("Mot."). Resnick requests such relief because he suffers from chronic medical conditions (including diabetes and related end-stage liver disease) that render him particularly vulnerable to COVID-19. Resnick further asserts that, because he is close to meeting the criteria for the BOP's Elderly Reentry Pilot Program, the Court should release him on that basis as well. (Mot. at 2-3).

Resnick asks that he be immediately release to his wife's home in Connecticut, notwithstanding the mandatory 14-day quarantine period Attorney General Barr has put in place for prisoners being released during the COVID-19 crisis (Attorney General William Barr Memo, dated March 26, 2020). Resnick suggests that such quarantine is not indicated for his situation, and that it would subject him to additional unnecessary risk of contracting COVID-19.

Resnick's proposed release plan provides that:

- Mr. Resnick's wife Amy, who lives a little over an hour from the facility, would pick Resnick up in her car.

2

EXHIBIT 1
39

Case 1:12-cr-00152-CM    Document 461    Filed 04/02/20    Page 3 of 14

- She would provide him with an N-95 mask (and will wear the same
  herself), as well as other personal protective equipment (PPE) to cover
  him completely during the journey to her apartment.

- Resnick would reside with his wife in their two bedrooms and two
  bathroom apartment; allowing Resnick to fulfill a decontamination
  protocol upon arrival, and complete a period of self-quarantine.

(Mot. at 3).

### Compassionate Release Under 18 U.S.C. § 3582(c)

Section 3582(c) begins with the principle that "a court may not modify a term of

imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see also United States v. Goode*,

No. 14 Cr. 810 (CM), 2020 WL 58272, *1 (S.D.N.Y. Jan. 6, 2020); *United States v. Israel*, No.

05 Cr. 1039 (CM), 2019 WL 6702522, *1 (S.D.N.Y. Dec. 9, 2019). Prior to the enactment of

the First Step Act, a court could not modify a defendant's duly-imposed sentence on

compassionate release grounds unless it received a motion from the BOP asking that the court

consider such modification. *See, e.g., United States v. Goode*, 2020 WL 58272 at *1 (citing

U.S.S.G. § 1B1.13 Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A)

(Policy Statement) (Effective Nov. 1, 2006; amended effective Nov. 1, 2007; Nov. 1, 2010; Nov.

1, 2016; Nov. 1, 2018)); *Stewart v. United States*, 13 Civ. 5279 (JGK), No. 02 Cr. 395 (JGK),

2013 WL 4044756, *3-6 (S.D.N.Y. Aug. 9, 2013); *United States v. Iosifidis*, No. 13 Cr. 170

(JFK), 2016 WL 3267329, *2 (S.D.N.Y. June 9, 2016).

On December 21, 2018, Congress passed the First Step Act, Pub. L. No. 115-391, which

amended 18 U.S.C. § 3582(c)(1) to permit a court to consider a defendant's motion for

compassionate release following the exhaustion of his or her administrative remedies with the

BOP or 30 days after submitting a request to the appropriate Warden, whichever is sooner:

3

EXHIBIT 1
40

> The court <u>may not modify a term of imprisonment once it has been imposed</u>
> <u>except that</u>, . . . the court, upon motion of the defendant after the defendant
> has fully exhausted all administrative rights to appeal a failure of the Bureau
> of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days
> from the receipt of such a request by the warden of the defendant's facility,
> whichever is earlier, <u>may reduce the term of imprisonment</u>...

18 U.S.C. § 3582(c)(1)(A) (emphasis added). The First Step Act did not amend the

eligibility requirements for compassionate release, which are set forth in 18 U.S.C. §

3582(c)(1)(A) and Section 1B1.13 of the United States Sentencing Guidelines. The court

can only modify a sentence if, "after considering the factors set forth in section 3553(a) to

the extent they are applicable," it finds that "extraordinary and compelling reasons warrant

such a reduction," 18 U.S.C. § 3582(c)(1)(A)(i); or that the defendant is at least 70 years old

and has served at least 30 years in prison, among other things. 18 U.S.C. § 3582(c)(1)(A)

(ii). In either case, the proposed reduction must be "consistent with applicable policy

statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

   The Application Notes to Section 1B1.13 describe the circumstances under which

"extraordinary and compelling reasons exist." U.S.S.G. § 1B1.13 Application Note 1. These

include an assessment of the defendant's medical condition and his or her age:

   (A) Medical Condition of the Defendant—

      (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and
      advanced illness with an end of life trajectory). A specific prognosis of life
      expectancy (*i.e.*, a probability of death within a specific time period) is not
      required. Examples include metastatic solid-tumor cancer, amyotrophic lateral
      sclerosis (ALS), end- stage organ disease, and advanced dementia.

      (ii) The defendant is—

         (I) suffering from a serious physical or medical condition,

         (II) suffering from a serious functional or cognitive impairment, or

         (III) experiencing deteriorating physical or mental health because of
         the aging process,

4

EXHIBIT 1
41

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant – The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

U.S.S.G. § 1B1.13 Application Note 1.

Resnick's motion is predicated on his medical condition, in combination with the present COVID-19 pandemic.

BOP Program Statement No. 5050.50, "Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582, 4205(g)," sets forth the administrative procedures that the BOP follows when considering inmate requests, as well as the substantive criteria used by the BOP to evaluate whether a motion for a sentence modification is appropriate. As is relevant here, an elderly defendant may be considered for a reduced sentenced if the following criteria are met:

(i)     Age 65 and older;

(ii)    Suffer from chronic or serious medical conditions related to the aging process;

(iii)   Experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility;

(iv)    Conventional treatment promises no substantial improvement to their mental or physical condition;

(v)     Have served at least 50% of their sentence.

U.S. Department of Justice, Federal Bureau of Prisons, Program Statement, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582, 4205(g), OPI OGC/LCI, No. 5050.50 (Jan. 17, 2019).

The defendant bears the burden of proving that he is entitled to relief under 18 U.S.C.

5

EXHIBIT 1
42

§ 3582. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant

seeks decreased punishment, he or she has the burden of showing that the circumstances

warrant that decrease); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at

*1 (S.D.N.Y. Oct. 29, 2010) (same).

### Pilot Program for Eligible Elderly Offenders

Prior to the enactment of the First Step Act in December 2018, Section 60541(g) of

Title 34, United States Code, part of the Second Chance Act of 2007, required the

establishment of a pilot program at one or more BOP facilities to evaluate early community

re-entry for eligible elderly offenders. The Pilot Program was authorized and funded for 2009

and 2010. 34 U.S.C. § 60541(g)(1)(A), (g)(3) (2014). Section 60541 established minimum

requirements for "eligible elderly offenders," *id.* § 60541(g)(5)(A) (2014),[1] but left the

decision about which eligible elderly offenders to release to the discretion of the Attorney

General in two ways. First, the pilot program was not required to be established at all BOP

facilities but only at "a Bureau of Prisons facility." *id.* § 60541(g)(1)(A) (2014). Second, the

statute provided that the Attorney General "may release some or all eligible elderly offenders

from the Bureau of Prisons facility to home detention," *id.* § 60541(g)(1)(B) (2014), and thus

expressly did not require that every eligible elderly offender be placed in home confinement.

As is relevant here, the First Step Act reauthorized and expanded the Pilot Program.  Under

the First Step Act, the Pilot Program is re-established and funded for the years 2019 through

2023. Pub. L. No. 115-391, § 504(b)(1)(A). In addition, 34 U.S.C. § 60541(g) is modified to

provide in relevant part:

> (A)  The Attorney General shall conduct a pilot program to
> determine the effectiveness of removing eligible elderly offenders and

---

[1] An eligible elderly offender was an inmate who was at least 65 years old and had served the greater of 10 years'
imprisonment or 75% of his or her release.

6

EXHIBIT 1
43

eligible terminally ill offenders from a Bureau of Prisons facilities and placing such offenders on home detention until the expiration of the prison term to which the offender was sentenced.

        (B) In carrying out a pilot program as described in subparagraph A, the Attorney General may release some or all eligible elderly offenders and eligible terminally ill offenders from the Bureau of Prisons facilities to home detention upon written request from either the Bureau of Prisons or an eligible elderly offender or terminally ill offender.

Pub. L. No. 115-391, § 603; *see also* 34 U.S.C. § 60541(g)(1)(A), (B). The First Step Act further modifies 34 U.S.C. § 60541 to state: "the term 'eligible elderly offender' means an offender in the custody of the Bureau of Prisons – (i) who is not less than 60 years of age; (ii) who is serving a term of imprisonment that is not life imprisonment ... and has served 2/3 of the term of imprisonment to which the offender was sentenced..." Pub. L. No. 115-391, § 603; *see also* 34 U.S.C. § 60541(g)(5)(A). The First Step Act did not remove the Attorney General's discretion in determining which eligible elderly offenders or eligible terminally ill offenders to release to home confinement under the pilot program.

        BOP Operations Memorandum No. 001-2019, "Home Confinement under the First Step Act," sets forth the administrative procedures that the BOP will follow when considering inmate eligibility for the "Pilot Program for Eligible Elderly Offenders and Terminally Ill Offenders," and the substantive criteria used by the BOP to evaluate eligible elderly offenders. As is relevant here, an eligible elderly offender is defined as an offender in the custody of the BOP:

1)    who is not less than 60 years of age;

2)    who is serving a term of imprisonment that is not life imprisonment based on a conviction for an offense or offenses that do not include any crime of violence, sex offense, offense under 18 U.S.C. § 2332b(g)(5)(B), or offense under chapter 37 of Title 18, and has served 2/3 of the term of imprisonment to which the offender was sentenced;

3)    who has not been convicted in the past of any Federal or State crime of

7

EXHIBIT 1
44

violence, sex offense, or other offense described in paragraph (2), above;

4)  who has not been determined by the Bureau, on the basis of information the
    Bureau uses to make custody classifications, and in the sole discretion of the
    Bureau, to have a history of violence, or of engaging in conduct constituting a
    sex offense or other offense described in paragraph (2), above;

5)  who has not escaped, or attempted to escape, from a Bureau of Prisons
    institution;

6)  with respect to whom the Bureau of Prisons has determined that release to
    home detention under this section will result in a substantial net reduction of
    costs to the Federal Government; and

7)  who has been determined by the Bureau to be at no substantial risk of engaging
    in criminal conduct or of endangering any person or the public if released to
    home detention.

U.S. Department of Justice, Federal Bureau of Prisons, Operations Memorandum,

Home Confinement under the First Step Act, OPI RSD/RRM, No. 001-2019 (Apr. 4,

2019).

**Covid-19 and the Attorney General's Guidance to BOP**

The world is presently in the grip of a pandemic due to the new coronavirus that causes

the viral disease known as COVID-19.

In light of this unprecedented crisis, and while recognizing the ability of the Bureau of

Prisons to deal with COVID-19 outbreaks within its facilities, the Attorney General has directed

the Bureau of Prisons, when assessing compassionate release applications, to prioritize the

transfer of incarcerated inmates to home confinement "where appropriate" to decrease the risks

to their health.  In assessing which inmates BOP should consider seriously for compassionate

release, the Bureau is expected to consider:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers
  of  Disease Control and Prevention (CDC) guidelines;

- The security level of the facility where the inmate resides, with priority given to those
  residing in low and medium security facilities;

8

EXHIBIT 1
45



DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_  April 1, 2020  _

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

April 1, 2020

**BY ECF AND EMAIL**
The Honorable Victor Marrero
United States District Court Judge
New York, New York 10007

Re:    *United States v. Pedro Hernandez*, 19 Cr. 169 (VM)

Dear Judge Marrero:

The parties write to request an urgent modification of the Court's March 30, 2020 order granting the defendant's temporary pretrial release with certain conditions. (Doc. No. 163).

One such conditions was: "Home incarceration at a homeless shelter designated by the New York City Department of Homeless Services, with monitoring by means chosen at the discretion of Pretrial Services." Paragraph 3(c). Another condition was that: "The defendant shall be released upon the signature of the defendant on the bond and upon the Pretrial Services Office's installation of the monitoring technology that it selects." Paragraph 3(j).

Pretrial Services advises that, because of the defendant's quarantine status, he cannot be fitted with any monitoring technology for 14 days and therefore he cannot be released from custody without a modification of the Court's order. Accordingly, the parties request that the Court suspend the monitoring conditions in the March 30, 2020 order for 14 days, so that the defendant can be released from custody immediately.

Pretrial Services has advised the Government that, with the proposed modification, the defendant will be released from custody.

**SO ORDERED:**  **April 1, 2020**

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:    *Justin Rodriguez*

_____
Victor Marrero
U.S.D.J.

Justin V. Rodriguez
Assistant United States Attorney
(212) 637-2591

cc:    Counsel of record (by ECF and email)

EXHIBIT 1
46

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
UNITED STATES OF AMERICA            :      ORDER
                                    :
         - v. -                     :      19 Cr. 169 (VM)
                                    :
PEDRO HERNANDEZ,                    :
                                    :
              Defendant.            :
------------------------------------X

VICTOR MARRERO, U.S.D.J.

        Upon the application of defendant Pedro Hernandez, pursuant
to 18 U.S.C. § 3142(i) for temporary release from custody during
the current COVID-19 pandemic (Dkt. Nos. 160 and 161), and the
Government's consent based on the terms and conditions set forth
herein, IT IS HEREBY ORDERED:

    1.   The Court's decision in this case is based on, among
other things, the unique confluence of serious health issues and
other risk factors facing this defendant, including the
defendant's age (64 years old), asthma, and high blood pressure,
which place him at a substantially heightened risk of dangerous
complications should he contract COVID-19 as compared to most other
individuals. Accordingly, this Order should not be construed as a
determination by this Court that pretrial detention is unsafe or
otherwise inappropriate as a general matter or in any other
specific case.

                                    1

EXHIBIT 1
47

2.    Pursuant to 18 U.S.C. § 3142(i), the Court concludes that compelling reasons exist for temporary release of the defendant from custody during the current public health crisis. Accordingly, the defendant's application is GRANTED pursuant to the following conditions:

3.    The Clerk of Court is directed to prepare a personal recognizance bond with the following conditions of release:

a.    A personal recognizance bond in the amount of $50,000, to be signed by the defendant;

b.    All mandatory conditions of release included in this Court's standard "Order Setting Conditions of Release" form;

c.    Home incarceration at a homeless shelter designated by the New York City Department of Homeless Services, with monitoring by means chosen at the discretion of Pretrial Services. The defendant shall be on 24-hour lockdown in the shelter except for emergency medical visits and visits with his attorneys. Any other leave from the shelter must be approved by either the Pretrial Services officer or by the Court on application from defense counsel.

d.    Pretrial Services supervision as directed by the Pretrial Services Office;

e.    Surrender all passports and other travel documents and make no applications for new or replacement documents;

2

EXHIBIT 1
48

f.   Drug testing and treatment as directed by the Pretrial Services Office;

g.   The defendant shall not possess a firearm, destructive device, or other weapon;

h.   The defendant shall not use or possess any narcotic drug or controlled substance unless prescribed by a licensed medical practitioner;

i.   The defendant shall have no contact whatsoever with any of his codefendants charged in Docket Number 19 Mag. 118 or 19 Cr. 169, including Angela Bosquez, Manolo Dones, Luis Garcia, Joanna Martinez, Alberto Pellot, and Edward Torres;

j.   The defendant shall be released upon the signature of the defendant on the bond and upon the Pretrial Services Office's installation of the monitoring technology that it selects; and,

k.   Upon the defendant's release, the defendant must report directly to the intake unit for homeless men operated by the New York City Department of Homeless Services at 400 East 30th Street, New York, New York.

4.   The Pretrial Services Office is directed to immediately alert the Court, the Government, and defense counsel of any violation of the above conditions, without need for a formal violation petition. The defendant is hereby notified that

3

EXHIBIT 1
49

violation of the conditions of release will likely result in revocation of this temporary release.

5.   Defense counsel is directed to submit a status update letter to the Court once a week after consultation with the Government, informing the Court as to the defendant's status and health.  If defense counsel identifies other living arrangements for the defendant, for example, with the defendant's daughters or other family members, defense counsel must notify the Court of that fact in its weekly status update letter to the Court.

6.   This Order is subject to modification or revocation by the Court at any time.  The Court intends to terminate the defendant's temporary release and return the defendant to pretrial detention as soon as the Court concludes that the defendant no longer faces the acute health risk posed by the current circumstances.

7.   This Order is without prejudice to any future application by either party seeking to amend it.

SO ORDERED.

Dated: New York, New York
       March 30, 2020

_____
        Victor Marrero
        U.S.D.J.

4

EXHIBIT 1
50

Case 4:17-cr-00618    Document 57    Filed on 04/02/20 in TXSD    Page 1 of 7

United States District Court
Southern District of Texas

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
Sheet 1

**ENTERED**
April 02, 2020
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## Southern District of Texas
### Holding Session in Houston

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| **ANTHONY MACE** | ) Case Number: 4:17CR00618-001 |
| | ) USM Number: 32734-479 |
| Date of Original Judgment: September 28, 2018 | ) Nicolas Bourtin & Ann-Elizabeth Ostrager |
| *(Or Date of Last Amended Judgment)* | ) *Defendant's Attorney* |

**Reason for Amendment**

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))

☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))

☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))

☐ Correction for Clerical Mistake (Fed. R. Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. § 3563(c) or 3583(e))

*☒ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))

☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

☐ Direct Motion to District Court Pursuant to ☐ 28 U.S.C. § 2255 or ☐ 18 U.S.C. § 3559(c)(7)

☐ Modification of Restitution Order (18 U.S.C. § 3664)

**THE DEFENDANT:**

☒ pleaded guilty to count(s) 1 on November 9, 2017 _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15 U.S.C. §§ 78dd-2 and 3, and 18 U.S.C. § 371 | Conspiracy to violate the Foreign Corrupt Practices Act | 12/31/2011 | 1 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 2, 2020
Date of Imposition of Judgment

Signature of Judge

**DAVID HITTNER**
**UNITED STATES DISTRICT JUDGE**
Name and Title of Judge

April 2, 2020
Date

1

EXHIBIT 1
51

Case 4:17-cr-00618   Document 57   Filed on 04/02/20 in TXSD   Page 2 of 7

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 2 — Imprisonment

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___2___ of ___7___

DEFENDANT: **ANTHONY MACE**
CASE NUMBER: **4:17CR00618-001**

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a
total term of :   TIME SERVED (16 months and 14 days)

☐   The court makes the following recommendations to the Bureau of Prisons:

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____   ☐ a.m.   ☐ p.m.   on _____

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

EXHIBIT 1
52

AO 245C (Rev. 09/15)   Amended Judgment in a Criminal Case
                        Sheet 3 — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page __3__ of __7__

DEFENDANT: **ANTHONY MACE**
CASE NUMBER: **4:17CR00618-001**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of : 14 months and 7 days

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

EXHIBIT 1
53

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA

v.

ANTHONY MACE

§
§
§
§
§
§
§

Criminal Action No. H-17-618

ORDER FOR REDUCED SENTENCE AND RELEASE TO HOME
CONFINEMENT PURSUANT TO
18 U.S.C. § 3582(c)(1)(A)

Pending before the Court is Expedited Motion for Reduced Sentence and Release to Home Confinement Pursuant to 18 U.S.C. § 3582(C)(1)(A)(i) in Light of the COVID-19 Emergency (Document No. 54). Having considered the motion, submissions, and applicable law, the Court determines the motion should be granted.

On November 9, 2017, Defendant Anthony Mace ("Mace"), an English citizen, waived extradition and indictment. The same day, Mace pleaded guilty to a Criminal Information charging him with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") in violation of 18 U.S.C. § 371. On September 28, 2018, the Court sentenced Mace to imprisonment for a term of thirty-six months.

On October 22, 2019, the Department of Justice ("DOJ") approved Mace's application to be transferred to a prison in England pursuant to the International Prisoner Transfer Program. On February 25, 2020, Mace was transferred from Moshannon Valley Correctional Center in Philipsburg, Pennsylvania to the

EXHIBIT 1
54

Metropolitan Correctional Center ("MCC") in New York City, New York to await his then-imminent transfer to England. However, Mace's transfer has been suspended in light of the COVID-19 pandemic. On March 27, 2020, Mace moved for a reduced sentence and release to home confinement.[1]

The First Step Act provides this Court with authority to consider motions for compassionate release filed by defendants. *See* First Step Act of 2018, § 603, Pub. L. No. 115-391, 132 Stat. 5194, 5239–40 (2018); 18 U.S.C. § 3582(c)(1)(A)(i). The Court has discretion to modify a prison term to home confinement: (1) after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable; (2) if it finds that extraordinary and compelling reasons warrant such a reduction; and (3) if it finds a reduction is consistent with applicable policy statements in U.S.S.G. § 1B1.13. *See United States* v. *Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *7 (S.D. Tex. June 17, 2019) (Marmolejo, J.); 18 U.S.C. § 3582(c)(1)(A)(i). Because the policy statements were not updated after the enactment of the First Step Act, the Court may determine whether the defendant has shown extraordinary and compelling reasons for compassionate release. *See Cantu*, 2019 WL 2498923 at *5 (S.D. Tex. June 17, 2019) (Marmolejo, J.).

---

[1] The Court notes Mace's lengthy motion, filed by his New York counsel, Sullivan & Cromwell LLP, contains references to New York political officials and comments on alleged conditions within the Federal Bureau of Prisons. Such inappropriate comments were not persuasive to this Court in reaching its ultimate, legal decision herein.

2

EXHIBIT 1
55

Mace is sixty-eight years old and an English citizen.[2] Mace waived extradition and accepted responsibility by pleading guilty to a violation of the FCPA in connection with his role with his former business.[3] Mace has no other criminal convictions or arrests.[4] Mace has been incarcerated since November 20, 2018,[5] and has already served approximately sixteen months of his sentence. In addition, Mace cooperated with DOJ and was approved for transfer to England to serve the remainder of his sentence.[6] Because of Mace's approval for transfer by DOJ and in light the current COVID-19 pandemic, the Court finds extraordinary and compelling reasons warrant release to home confinement. Careful consideration of the applicable factors in 18 U.S.C. § 3553(a) also support the Court's finding that release to home confinement is appropriate. Thus, the motion for reduced sentence and release to home confinement is granted. Accordingly, the Court hereby

**ORDERS** that Defendant Anthony Mace's Expedited Motion for Reduced Sentence and Release to Home Confinement Pursuant to 18 U.S.C. §

---

[2] *Expedited Motion for Reduced Sentence and Release to Home Confinement Pursuant to 18 U.S.C. § 3582(C)(1)(A)(I) In Light of The COVID-19 Emergency,* Document No. 54 at 1–2 [hereinafter *Motion for Home Confinement*].

[3] *Plea Agreement,* Document No. 18.

[4] *Final Presentence Report,* Document No. 40.

[5] *Imprisonment and Executed Judgment,* Document No. 50.

[6] *Motion for Home Confinement, supra* note 2, at 4.

3

EXHIBIT 1
56

3582(C)(1)(A)(i) in Light of the COVID-19 Emergency (Document No. 54) is **GRANTED**. Mace will remain in home confinement, within the jurisdictional boundaries of the Southern District of New York, for what would have otherwise been the remainder of his term of imprisonment pending his transfer to the United Kingdom. The Federal Bureau of Prisons is directed to proceed expeditiously to avoid any unnecessary delay in Mace's release from custody and his ultimate return to the United Kingdom.

SIGNED at Houston, Texas, on this _____1_____ day of April, 2020.

DAVID HITTNER
United States District Judge

4

EXHIBIT 1
57

## COVID-19 Action Plan: Phase Five

Additional Agency-wide Actions Effective April 1



Updated 6:30 PM ET, March 31, 2020

**(BOP) -** Today, the Director of the Bureau of Prisons (BOP) ordered the implementation of Phase 5 of its COVID-19 Action Plan, effective tomorrow, April 1, 2020. In response to a growing number of quarantine and isolation cases in our facilities, the BOP will take the following actions immediately to further mitigate the exposure and spread of COVID-19.

- For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior.
- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.
- In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.
- After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.
- Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

Starting in January 2020, the BOP implemented its Pandemic Influenza contingency plan, modified as an Action Plan for COVID-19. The BOP continues to revise and update its action plan in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance from experts at the World Health Organization (WHO), the Centers for Disease Control and Prevention (CDC) and the Office of Personnel Management (OPM).

Background on Phases 1 - 4:

Phase 4: On March 26, 2020, the BOP implemented revised preventative measures for all institutions. The agency updated its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. This includes all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival. Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

These are the latest measures that follow the first three phases of the Bureau's action plan, which may be found here: www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf

The Bureau will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/

## EXHIBIT "D"

EXHIBIT 1
58

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**LANDAU LAW LLP, 1880 Century Park East, Suite 1101, Los Angeles, CA 90067.**

A true and correct copy of the foregoing document entitled (*specify*): **_Trustee's Notice of Emergency Motion and_**
**_Emergency Motion for Preliminary Injunction and Prejudgment Writ of Attachment; Memorandum of Points and_**
**_Authorities; Declaration of Jack A. Reitman; Exhibit_** will be served or was served (a) on the judge in chambers in the
form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
**April 16, 2020,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **D Edward Hays    ehays@marshackhays.com,**
  **ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com**
- **Richard A Marshack (TR)    pkraus@marshackhays.com, rmarshack@iq7technology.com**
- **Ryan D O'Dea    rodea@shulmanbastian.com, LGauthier@shulmanbastian.com**
- **Jack A. Reitman    jareitman@landaufirm.com,**
  **srichmond@landaufirm.com;vrichmond@landaufirm.com;avedrova@landaufirm.com**
- **Monica Rieder    mrieder@landaufirm.com, vrichmond@landaufirm.com;avedrova@landaufirm.com**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**
- **David Wood    dwood@marshackhays.com,**
  **dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com**

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____ I served the following persons and/or entities at the last known addresses in this bankruptcy case or
adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class,
postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will
be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **April 16, 2020,** I served the
following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

VIA FEDEX OVERNIGHT                              VIA EMAIL
**Honorable Catherine E. Bauer**                Lisa Storie-Avenatti
United States Bankruptcy Court Central District of California    lisajstorie@yahoo.com
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5165/ Courtroom 5D
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 16, 2020 | Vanessah Richmond | /s/ Vanessah Richmond |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                      **F 9013-3.1.PROOF.SERVICE**